Vito J. Titone, J.
The petitioners are Adrienne Renelli, a resident of the Willowbrook State School, and her parents. They have instituted this article 78 proceeding seeking, among other things, a judgment directing the respondents to provide such individual care and treatment for Miss Renelli as will give her a realistic opportunity to improve her mental condition. Originally the action was commenced in Bronx County, but the venue was changed to Richmond County upon motion of the respondents.
Adrienne had been a Willowbrook resident for over 12 years prior to the Commencement of suit and during that time her parents expressed constant dissatisfaction with the treatment that she was receiving. Apparently there had been over 100 different complaints, but the parents claim they met with constant frustration and little satisfaction. Thus they decided to resort to the courts in order to secure what they felt should be proper treatment for their daughter. The respondents’ motion to dismiss the cause for lack of jurisdiction was denied in an opinion by the court dated September 1, 1972, and the matter *262 was set down for a hearing. There were extensive discussions among the court and counsel in an attempt to work out an amicable solution for petitioners’ grievances, which were to no avail, and a lengthy trial followed. The court concludes that the petitioners are entitled to the relief hereinafter set forth.
Subdivision 1 of section 22 of the old Mental Hygiene Law provided that: ‘‘ The department (of mental hygiene) shall provide sufficient institutions, facilities and services in the department for the care and treatment of the mentally disabled of the state and for such other related purposes as shall be provided and authorized by this chapter. ’ ’
The responsibilities of the department were spelled out in greater detail by the enactment of a new Mental Hygiene Law effective January 1, 1973, that provides in subdivision (a) of section 7.05: ‘ ‘ The department is charged with the execution of the provisions of this chapter. It shall have the responsibility for developing comprehensive plans, programs, and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and" training of the mentally ill, the mentally retarded, and those suffering from alcoholism, narcotic addiction, or drug abuse. It shall develop such plans, programs, and services in cooperation with local government and with community organizations and agencies. It shall provide appropriate facilities and encourage the provision of facilities by local government and community organizations and agencies.”
Subdivision (c) mandates that: “ The department shall have the responsibility for seeing that the classes of persons specified in the foregoing subdivision are provided with care .and treatment, that such care and treatment is of high quality and effectiveness, and that the personal and civil rights of persons receiving care and treatment are adequately protected.”
Section 120 provides that institutions such as Willowbrook are to furnish their residents with “ care, treatment, training and education ”. The purpose of these State schools is not to incarcerate but to train. (Excelsior Ins. Co. of N. Y. v. State of New York (296 N. Y. 40, 44 [1946].) The duty of the State is to treat and care for its wards, (p. 46.)
The reasoning behind this is clear. Merely to place a person like Adrienne in an institution and then “ forget her ”, that is, make no attempt at treatment, is the same as imprisonment — and she has committed no crime. The rule was aptly stated in Wyatt v. Stickney (325 F. Supp. 781, 784 [M. D. Ala. N. D., 1971]) where the court said:
*263 “ When patients are so committed for treatment purposes - they unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition. Rouse v. Cameron, 125 U. S. App. D. C. 366, 373 F. 2d 451; Covington v. Harris, 136 U. S. App. D. C. 35, 419 F. 2d 617. Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed ‘ into a penitentiary where one could be held indefinitely for no convicted offense.’ Ragsdale v. Overholser, 108 U. S. App. D. C. 308, 281 F. 2d 943, 950 (1960).”
It is seen that Adrienne has a right to adequate treatment under both the Mental Hygiene Law and the Constitution. The question is whether or not she has received it.
Adrienne was reluctantly placed in Willowbrook by her parents at the age of 10, some 12.years ago. This was done on the advice and urging of various physicians, since it was felt that she could not receive appropriate treatment at home and that the higher degree of care required for her would result in inadequate attention being given to other members of the family.
The Department of Mental Hygiene records show that Adrienne entered Willowbrook on September 6,1960. She was given a physical examination, and eertain tests, including a Kuhlmann test, were performed regarding her mental capabilities. On September 14, 1960, the Screening Committee found that she needed “ help in all areas”, yet decided that she should be placed in “ custodial care ” only. From that day to this, she was treated as a lost cause. It does not appear that she was ever enrolled in any program of formal training. She was never again evaluated or tested, except for an examination that was done just prior to and in preparation for this litigation.
The testimony showed that the responsibility for observing and earing for Adrienne was left almost completely to overworked and undertrained ward attendants. Individual care, for all practical purposes, was nonexistent.
It seems clear that someone in the Willowbrook bureaucracy decided 12 years ago that- Adrienne was, in effect, a hopeless case, and no meaningful attempt was ever made to improve her condition. She was “ warehoused ” and ignored.
Dr. Hammond testified in substance that in his opinion there was relatively little that could be done for this patient. The petitioners’ several experts unanimously disagreed. It was their feeling that with organized and constantly applied training, as opposed to sporadic, catph-as-catch can treatment, Adrienne *264 could become toilet-trained, that she could learn to feed herself and to perform other elementary functions, and that this was true when she entered Willowbrook in 1960. The court agrees with their conclusions.
The point here is (and this is where the State has failed to meet its obligations) Adrienne has yet to be given a first chance. She was entitled to this, and had any realistic effort been made, she would have improved. As shown by the testimony, of several attendants, the only ‘ ‘ training ’ ’ she has ever had is the very occasional attention which the experts say will not work. It appears that the attendants minister to Adrienne ‘ ‘ when they have time ” and for not more than a few minutes at a time. The following testimony from one of the attendants is an example
“ the oourt: Have you been working with Adrienne?
miss chambees: Sometimes. Not every day. I don’t have time, you know.
the court: But how often do you work with her?
miss chambers: Sometimes, like two or three times a week. Maybe, sometimes it’s once a week.
the court: For how long?
miss chambers: Maybe five minutes or ten minutes. It all depends, you know.”
Normal children would not make meaningful progress with such treatment; it is easy to see why in Adrienne’s case not only was no improvement realized, but she has actually deteriorated while in the care and custody of the State.
In this connection, the mother testified that prior to her admission, Adrienne was a cheerful, gentle child and had no tendency to inflict physical harm on herself. A notation in her Willow-brook record for March, 1965 reveals that she was affectionate, content, played well with others and could dress herself. Now, however, she is described as cranky, antisocial, withdrawn, belligerent, unable to dress herself, and having a pronounced tendency to do herself and others physical damage.
Even now, the respondents admit that they plan no change in their policy of nontreatment, that nothing more than mere custodial care is contemplated for Adrienne. Obviously she is not going to be afforded the care and treatment “ of high quality and effectiveness ” required by subdivision (c) of section 7.05 of the new Mental Hygiene Law.
As for the general conditions at Willowbrook, it is conceded that the institution is understaffed, that sanitary conditions leave a lot to be desired and that the entire facility is not adequate for the number of residents. Matters reached a head at *265 the height of the “ job freeze ” instituted in this State, and about a year ago the Willowbrook situation erupted throughout the media. In this instance the fourth estate functioned in the finest traditions of a free press, for they did an excellent job in exposing conditions at this institution. Especially to be commended are the Staten Island Advance, New York Times, WPIX-TY and WABC-TY, who not only revealed the situation but have refused to * ‘ let it die ”.
During the trial, the court went to Willowbrook and made a personal inspection of several buildings. The “ changes ” that were made can best be described as cosmetic, a sop for the press. Wards were painted, there were new bedspreads, signs such as “ Motivation Department ” had been put up. There was, however, no change of substance. The wards are still overcrowded and understaffed. The sanitary conditions and feeding systems could stand considerable improvement.
The foregoing, of course, are observations concerning the institution as a whole, and we are here concerned with Adrienne Benelli. However, she does not exist in a vacuum — one cannot intelligently evaluate her situation without analyzing her environment.
Based on the existence of these conditions, the court strongly urges the Legislature to conduct further hearings into the manner in which the mental institutions of this State are run and take testimony on what is needed in the way of manpower and funding to bring them up to acceptable standards. The court is aware that this would be quite costly, but if the State of New York is going to undertake the responsibility for the care and treatment of these patients, then the job must be done right. Nothing less can.be acceptable. As noted above, the Legislature did enact a new Mental Hygiene Law and many laudatory provisions were put on the books, but, without money arid personnel, conditions will riot improve.
In view of this case, where an initial admission error went unchanged for years, the court would recommend the establishment of an independent case evaluation system. The new law does provide for periodic reviews as to whether or not a patient should be released or retained. There appears to be no mechanism for an independent means of determining if the care afforded a patient like Adrienne is meeting the quality requirements of the Mental Hygiene íaw. In other words, while the-question of whether or not a person should be released is obviously important, of equal significance is a means of insuring that those retained are receiving proper treatment. This, can only *266 be decided by an objective panel or individual not connected with the institution involved. Had such a review system, been in existence, it is doubtful that Adrienne would have merely vegetated all these years. The State’s stewardship of these unfortunate human beings should be subject to a periodic accounting.
The petitioners have sustained their burden of proving that the State has been derelict in the duties imposed upon it by both the Constitution and the Mental Hygiene Law, and the court has the jurisdiction and the power to see to it that the State meets its obligations. Within 30 days of the date hereof, the petitioners and the respondents, on eight days’ notice to each other, shall submit to the court an order containing a specific program of what the respondents are to do in the way of giving Adrienne the treatment and care needed to afford her the opportunity to be taught the elementary functions that she is capable of. The court does conclude, however, that the petitioners have not proven their contention that Adrienne was subjected to physical abuse by respondents’ employees.
It is a sorry state of affairs when those charged with the care of people like Adrienne must be forced by a court of law to fulfill their obligations, but apparently nothing less will produce results. For example,, the respondents flatly refused to follow the suggestion of the court made in conferences that the matter be worked out by the parties and an impartial panel of experts: Mutually acceptable procedures would have been preferable to .court orders.